## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN WEAVER and NASH WEITZMAN, individually and on behalf of all others similarly situated, | Docket No. 15-cv-8110-GHW (Assigned to the Honorable Gregory H. Woods, U.S.D.J.) |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| FANDUEL, INC., a Delaware corporation, and DRAFTKINGS, INC., a Delaware corporation, | |
| Defendants. | |

### SECOND AMENDED CLASS ACTION COMPLAINT[1] AND JURY TRIAL DEMAND

Plaintiffs John Weaver and Nash Weitzman (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their counsel, Alan C. Milstein of Sherman, Silverstein, Kohl, Rose & Podolsky, P.A., by way of Class Action Complaint and Jury Trial Demand against Defendants FanDuel, Inc. ("FanDuel") and DraftKings, Inc. ("DraftKings") (collectively, "Defendants"), hereby say, state, and aver as follows:

### INTRODUCTION

1.     This is a class action Complaint, brought pursuant to Federal Rule of Civil Procedure 23, against Defendants FanDuel and DraftKings, which operate daily fantasy sports ("DFS") websites in a manner that violates Florida, New York, North Carolina, and Massachusetts law, and the consumer protection and other laws of all fifty states.

### THE PARTIES

2.     Plaintiff John Weaver is a resident of Charlotte, North Carolina, and is a citizen of the State of North Carolina.  Mr. Weaver deposited money into accounts on the Defendants' sites

---

[1] On Thursday, October 29, 2015, counsel for Defendant FanDuel consented to the filing of this Second Amended Complaint.

in order to participate in daily fantasy sports contests of skill, and lost money as a result of the Defendants' unfair and/or deceptive conduct, as set forth more fully herein.

3.      Plaintiff Nash Weitzman is a resident of Cooper City, Florida, and is a citizen of the State of Florida.  Mr. Weitzman deposited money into accounts on the Defendants' sites in order to participate in daily fantasy sports contests of skill, and lost money as a result of the Defendants' unfair and/or deceptive conduct, as set forth more fully herein.

4.      Defendant FanDuel, Inc. is a Delaware corporation engaged in trade and commerce, with a principal place of business at 19 Union Square West, 9th Floor, New York, NY 10003.  Its registered agent for service of process is ATA Corporate Services, LLC, 222 Delaware Avenue, Suite 1200, Wilmington, DE 19801.  FanDuel is a citizen of the States of Delaware and New York.

5.      Defendant DraftKings, Inc. is a Delaware corporation engaged in trade and commerce, with a principal place of business at 125 Summer Street, Fifth Floor, Boston, MA 02110.  Its registered agent for service of process is Jason Robins, 376 Boylston Street, Suite 501, Boston, MA 02110.  DraftKings is a citizen of the States of Delaware and Massachusetts.

## SUBJECT MATTER JURISDICTION

6.      This Court has subject matter jurisdiction over the claims of all class members from all states pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), as there are more than 100 class members, those class members' claims exceed $5,000,000 in the aggregate, and basic diversity of citizenship is present, as at least one member of each Plaintiff class (including but not limited to Plaintiffs John Weaver and Nash Weitzman) is a citizen of a State that is different from at least one Defendant.

**PERSONAL JURISDICTION**

7.      This Court has personal jurisdiction over FanDuel because FanDuel is a resident of the State of New York, and further purposely avails itself of the market(s) within New York and this District on a systematic and continuous basis, and otherwise has sufficient minimum contacts with New York and this District, through the advertising, promotion, sale, and marketing in New York and this District of its daily fantasy sports websites and daily online fantasy sports tournaments and contests of skill, thus rendering the exercise of personal jurisdiction by this Court proper and necessary.

8.      This Court has personal jurisdiction over DraftKings because DraftKings purposely avails itself of the market(s) within New York and this District on a systematic and continuous basis, and otherwise has sufficient minimum contacts with New York and this District, through the advertising, promotion, sale, and marketing in New York and this District of its daily fantasy sports websites and daily online fantasy sports tournaments and contests of skill, thus rendering the exercise of personal jurisdiction by this Court proper and necessary.

**VENUE**

9.      Venue is proper in the United States District Court for the Southern District of New York because, among other things, a substantial part of the events giving rise to this lawsuit occurred within the territory encompassed by this Court, 28 U.S.C. § 1391(b)(2), and both Defendants are residents of this District, as defined in 28 U.S.C. § 1391(c)(2).

**FACTS COMMON TO ALL COUNTS**

**I.**

10.     The daily fantasy sports, or DFS, industry, is a non-regulated industry where individuals compete against each other in fantasy sports games on a daily basis.

11.     The industry has essentially "exploded" in popularity in recent years, and at least one research company has projected that DFS will produce $2,500,000,000 in annual revenue in the United States alone by the year 2020.

12.     An entire fantasy sports media industry dedicated to providing information and knowledge to fantasy sports participants has developed around DraftKings and FanDuel.

13.     To name just one example, SiriusXM launched a "Fantasy Sports Radio" channel (Channel 87), which numerous fantasy sports enthusiasts spend extensive time listening to and obtaining information from on a regular basis.

14.     At all times relevant to this Complaint, Defendants DraftKings and FanDuel had established themselves as two of the top television advertisers in the United States.

15.     Through the Defendants' immersive, unavoidable advertisements, and otherwise, the Defendants repeatedly held their daily fantasy sports games out as games in which skill made a difference, in fact *the* difference, between winning and losing.

16.     DraftKings' CEO Jason Robins has publicly stated and advertised that DraftKings attracts players "who are analytical and favor data and research."  Mr. Robins went on to state, "They do their homework.  It's like the stock market.  They enjoy looking at something and trying to figure out something that someone else doesn't see."  (Emphasis added.)

17.     Similarly, FanDuel advertised that players could "get paid for [their] knowledge" if they were "smarter than the average fan."

18.     Similarly, at all relevant times, the Defendants' web sites touted their fantasy sports games as games that were 100 percent legal in the United States because they were games of skill, rather than games of chance.

19.     Indeed, the Defendants have repeatedly, systematically, and continuously marketed daily fantasy sports as a game of skill akin to playing chess, and a skill-based activity

akin to investing in the stock market (making picks based upon a review of past performance and projections regarding the future).

20.     Daily fantasy sports games are also akin to pari-mutuel horse racing, poker tournaments, and other non-house-banked games in the sense that players play against each other, rather than the "house."

21.     Specifically, the Defendants operate daily fantasy sports tournaments where individuals compete against each other in large tournaments, head-to-head competitions, and other types of competitions, to see who can accumulate the highest number of points based upon the real-life statistics of players in professional sporting events that occur on a particular day.

22.     Tournament entrants choose a lineup of players at certain positions until they have reached a "salary cap" for their team.

23.     The players whose fantasy teams score the most points – based on the real statistics of real players in real games – win the most money.

24.     The aforementioned tournaments have entry fees as low as twenty-five cents and as high as $5,000, or more, and at all relevant times the most popular tournaments, including tournaments involving specific NFL weeks, attracted hundreds of thousands of participants.

25.     The Defendants make money on the fee or "rake" that they take from each entry into their contests.

26.     Moreover, the Defendants often "guarantee" prize pools, and will pay out the difference between the guarantee and the entry fees (called the "overlay," in industry parlance) in the event there are not enough entry fees.

27.     This provides the Defendants with an additional incentive to attract as many users and entries as possible into daily fantasy sports contests to avoid having to pay out this overlay, or to have their own employees win prize pool money through inside information.

28.     At the start of the 2015 NFL season, the Defendants spent more than $100,000,000 on television advertisements, and as a result of said ads, the Defendants added millions of new users.

29.     Indeed, as reported in an October 18, 2015, article in the <u>Washington Post</u>, "DraftKings and FanDuel, the daily-fantasy titans, have spent more than $205 million this year on a constant stream of advertisements that suggest, essentially, that anyone who sets a lineup can win a significant amount of money."

30.     The Defendants refer to their new, less skilled users as "fish," and rely on said users to keep their most active users/most profitable entry fee generators active on their site.

31.     FanDuel's CEO has also recognized the need to attract as many new, inexperienced players as possible to keep its most profitable players playing on the site.

32.     The Plaintiffs and the class members repeatedly paid entry fees to DraftKings and FanDuel in order to compete for cash prizes on those web sites.

## II.

33.     By the Defendants' own admission, in daily fantasy sports games, such as those operated and conducted by the Defendants, the single biggest "edge" that any participant can have comes from having data and information.

34.     The employees of DraftKings and FanDuel have access to an incredible amount of non-public data and information.

35.     The Defendants perform internal analytics to determine winning strategies, return on investment of certain strategies, and even how lineups on one site would do on the other site.

36.     Additionally, the Defendants' employees have access to and possess internal and proprietary real-time data on the current lineups of every player in every daily fantasy sports

contest, internal and proprietary real-time data about the value of certain players, and internal and proprietary real-time data on ownership percentages of every player.

37.    Because the goal of daily fantasy sports contests is to beat out other players, an employee or other insider with such statistical data and internal and proprietary information would have a significant edge over players such as the Plaintiffs and the class members, including but in no way limited to the ability to select players not on competitors' rosters.

38.    This only became known to the public when, in or around late September 2015, a DraftKings employee accidentally posted internal, proprietary information online while roster selection was still underway, demonstrating his access to same.   The very same week, this employee beat out *229,883* entrants in a DFS contest on FanDuel, coming in second place and winning a whopping $350,000, which the Defendants originally (and fraudulently) attempted to explain away as mere happenstance, before prohibiting such practices on October 6, 2015.

39.    Statistical analyses reveal that the "winning percentage" of this DraftKings employee significantly increased after he became employed by DraftKings.

40.    At all times prior to October 6, 2015, DraftKings allowed its employees to use material, non-public, internal, proprietary, and valuable data and information to gain an enormous edge over competitors on FanDuel's website, and additionally DraftKings knowingly allowed FanDuel's employees to compete against their own players, including the Plaintiffs and the proposed classes, using material, non-public, and valuable data and information.

41.    At all times prior to October 6, 2015, DraftKings failed to disclose this material fact to the Plaintiffs and the class members.

42.    Similarly, at all times prior to October 6, 2015, FanDuel allowed its employees to use material, non-public, internal, proprietary, and valuable data and information to gain an enormous edge over competitors on DraftKings' website, and additionally FanDuel knowingly

allowed DraftKings' employees to compete against their own players, including the Plaintiffs and the proposed classes, using material, non-public, valuable data and information.

43.     At all times prior to October 6, 2015, FanDuel failed to disclose this material fact to the Plaintiffs and the class members.

44.     DraftKings and FanDuel both communicated to customers that their employees were not allowed to play on their own sites, but fraudulently, recklessly, and/or negligently omitted the material fact that they were allowed to play on other sites and that other sites' employees were allowed to play on their site.

45.     Defendants also failed to disclose the fact that their employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

46.     At all relevant times, Defendants misrepresented that their DFS contests were contests of skill when, in fact, individuals with inside information were playing and winning.

47.     Prior to the disclosure of these material omissions and misrepresentations on October 6, 2015, the Plaintiffs and the class members deposited money into their DFS accounts on DraftKings and FanDuel, which monies the Plaintiffs and the class members would not have deposited had they known of the material omissions and material misrepresentations.

48.     The Defendants' material misrepresentations and omissions fraudulently induced the Plaintiffs and the class members to give the Defendants money, which ultimately went to the Defendants and their employees through fees and contest prizes.

49.     On information and belief, DraftKings and FanDuel's employees and insiders won at least $6,000,000, and more likely than not far more than that, as the result of DraftKings and FanDuel's material omissions and misrepresentations.

50.     Prior to October 6, 2015, when unbeknownst to him he was competing with employees and insiders with inside information, Plaintiffs John Weaver would typically "cash" in only two out of ten daily fantasy sports contests on DraftKings and FanDuel.

51.     Since October 6, 2015, when the employees and insiders were barred from competing, Mr. Weaver has "cashed" in a higher percentage of daily fantasy sports contests.

52.     Prior to October 6, 2015, when unbeknownst to him he was competing with employees and insiders with inside information, Plaintiff Nash Weitzman lost significant money playing on FanDuel (a net loss of $75,000), and significant money playing on DraftKings (a net loss of $60,000).

53.     Since approximately that date, when the employees and insiders were barred from competing, Mr. Weitzman has "cashed" in a higher percentage of daily fantasy sports contests, and partially erased some losses.

54.     Recently, (1) the Wall Street Journal reported that United States Attorney Prett Bharara (whose office led the "Black Friday" indictments of April 15, 2011, involving Full Tilt Poker and PokerStars, then the two biggest online poker operators doing business in the United States) is investigating whether daily fantasy sports operators such as FanDuel and DraftKings are in violation of federal law; (2) the Federal Bureau of Investigation and the Department of Justice have began a preliminary investigation of the daily fantasy sports industry; (3) various media outlets have reported that a federal grand jury focused upon the daily fantasy sports industry has been empaneled in the State of Florida; and (4) the Nevada Gaming Control Board, acting pursuant to the Nevada Gaming Control Act, issued a notice calling for unlicensed daily fantasy sports operators, such as FanDuel and DraftKings, to cease operating in the State of Nevada, effective immediately, which notice may serve as a bellwether for other states.

55.   On information and belief, the Defendants have engaged in other fraudulent, wrongful, reckless, and/or negligent conduct that has financially and otherwise harmed the Plaintiffs and the class members, and for which the Plaintiffs and the class members can recover, the exact nature of which is still unknown or is just becoming known.

## CLASS ACTION ALLEGATIONS

56.   This action is being brought as a class action under Federal Rules of Civil Procedure 23(a), 23(b)(l), 23(b)(2), and 23(b)(3), on behalf of a class ("Class") consisting of the following:

### National Class

**All persons in the United States of America who deposited money into a DraftKings or FanDuel account before October 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel, or any other daily fantasy sports site.**

### North Carolina Sub-Class

**All persons in North Carolina who deposited money into a DraftKings or FanDuel account before October 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel, or any other daily fantasy sports site.**

### Florida Sub-Class

**All persons in Florida who deposited money into a DraftKings or FanDuel account before October 6, 2015 and competed in any contest where other entries were made by employees from DraftKings, FanDuel, or any other daily fantasy sports site.**

57.   Excluded from the Class are (1) the Defendants, the Defendants' agents, subsidiaries, parents, successors, predecessors, and any other entity in which the Defendants or the Defendants' parents (if any) have any controlling interest, and those entities' current and former employees, officers, and directors; (2) the judge to whom this case is assigned and the judge's immediate family; (3) any person who executes and files a timely request for exclusion

from the Class; (4) any person who has had their claims in this matter finally adjudicated and/or otherwise released; and (5) the legal representatives, successors and assigns of any such excluded person.

58.     The Plaintiffs reserve the right to modify or amend the definition of the proposed Class, and to modify, amend, and/or remove the proposed sub-class, before the Court determines whether certification is appropriate and as the parties engage in the discovery process.

59.     The Class is so numerous that joinder of all members is impracticable.  See Federal Rule of Civil Procedure 23(a)(1).  Specifically, the class is comprised of over 100 people, and possibly thousands, tens of thousands, or even hundreds of thousands of individuals who were the Defendants' customers.  The exact size of the Class and the members thereof are ascertainable through the Defendants' business records.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions effecting solely individual members of the Class.  See Federal Rule of Civil Procedure 23(a)(2).  These questions include, but are in no way limited to, the following:

    a.     Whether the Defendants' employees used non-public data as described above to gain an advantage at DFS sites, whether the Defendants acted in concert to condone, allow, or promote this practice, whether the Defendants were negligent or otherwise acted wrongfully in allowing employees to access and use confidential data, and whether the Defendants were negligent or committed fraud in failing to disclose to the Plaintiffs and the proposed Class members that these practices were occurring;

    b.     Whether the Defendants made the material representations and omissions set forth above and substantially similar material representations to the Plaintiffs and the members of the proposed Class;

c.      Whether the Defendants' advertisements and other statements directed towards the Plaintiffs and the proposed Class members were false, misleading, or unfair;

d.      Whether the Defendants owed duties to the Plaintiffs and the proposed Class members, the scope of those duties, and if they breached those duties;

e.      Whether the Defendants fraudulently induced the Plaintiffs and the proposed Class members into using their websites, depositing money into the DFS accounts, and participating in DFS contests under false pretenses, through material misrepresentations, or through material omissions;

f.      Whether consumers such as the Plaintiffs and the proposed Class members were harmed by the Defendants' actions, as described in detail above;

g.      Whether the Defendants' Terms of Use were actually agreed to, and/or are unconscionable, illusory, fraudulent, or otherwise invalid or unenforceable;

h.      The extent of the damages caused by the Defendants' acts; and

i.      Whether the Defendants violated North Carolina and Florida state consumer protection statutes, as well as the consumer protection statutes of other states.

61.    The claims of the Plaintiffs and the Class arise from the same wrongful conduct, and are based upon the same legal theories.

62.    The Plaintiffs' claims are typical of the claims of the other members of the Class, as the Plaintiffs and all other members of the Class were damaged in the same way.  See Federal Rule of Civil Procedure 23(a)(3).

63.    The Plaintiffs will fairly and adequately represent the interests of the Class, and have retained counsel competent and experienced in class action litigation and uniquely qualified to represent the Class in matters relating to the unethical conduct of human subject research. See Federal Rule of Civil Procedure 23(a)(4).

64.     The Plaintiffs and their counsel are committed to vigorously pursuing this matter, and have the financial resources to do so.

65.     The Plaintiffs has no interests that are contrary to or conflicting with the Class.

66.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  See Federal Rule of Civil Procedure 23(b)(3).

67.     The expense and burden of individual litigation make it virtually impossible for the Class members individually to seek redress for the unlawful conduct alleged.

68.     Moreover, as set forth above, common questions of law and fact exist as to all members of the Class and predominate over any questions that solely affect individual members of the Class.

69.     The Plaintiffs knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

70.     Class certification is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4) for determination of particular issues of class-wide liability raised by the Plaintiffs' claims, such as the issues of law and fact listed above, and damages.

## COUNT ONE – NEGLIGENCE

71.     The Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

72.     The Defendants owed duties to the Plaintiffs and the Class members, as users and paying customers on their websites, to use reasonable care to provide true, reliable, correct, and accurate information and fair contests that were "on the level."

73.     The Defendants breached their duties to the the Plaintiffs and the Class members by failing to prevent individuals possessing inside information and data, by virtue of their employment at other DFS sites, from competing against the Plaintiffs and the class members.

74.     In the course and scope of their business, profession, and employment, the Defendants (individually and acting through their agents, servants, representatives, employees, and independent contractors) supplied false information to the Plaintiffs and the Class members.

75.     The Plaintiffs and the Class members justifiably relied upon the information supplied by the Defendants and, predicated upon the foregoing, engaged in business with the Defendants and lost money.

76.     The Defendants failed to use reasonable care in communicating information about the safety and security of data, employee access to data, and ability of employees to use material, non-public data to compete against the Plaintiffs and the Class members on other DFS websites and contests, or allow employees of other companies with material, non-public data to compete on the DFS website where the Plaintiffs and the Class members competed.

77.     As a direct and proximate result of the Defendants' negligence, the Plaintiffs and the Class members suffered damages and harm in an amount to be proven at trial.

### COUNT TWO – MISREPRESENTATION BY OMISSION, MISREPRESENTATION, AND FRAUD

78.     The Plaintiffs repeat each of the foregoing allegations as if fully set forth herein.

79.     The Defendants knowingly and/or recklessly made material representations that were false, and that the Defendants knew to be false and/or should have known were false.

80.     The Defendants made these material representations for the purpose of inducing the Plaintiffs and the Class members to act upon them.

81.     The Plaintiffs and the Class members justifiably relied upon these material misrepresentations.

82.     In addition, and/or in the alternative, the Defendants knowingly and/or recklessly omitted material facts, which the Defendants knew were material, for the purpose of inducing the Plaintiffs and the Class members to enter their DFS contests and/or otherwise act.

83.     The Plaintiffs and the Class members justifiably relied upon and acted based upon these material omissions.

84.     Specifically, and as set forth in detail above, the Defendants represented that their contests were fair and "on the level" games of skill; failed to disclose that employees, servants, agents, owners and/or others with access to non-public data would use said information to compete against the Plaintiffs and the Class members and obtain a greatly increased chance of winning, and correspondingly greatly decrease the ability of the Plaintiffs and the Class members to use skill in order to win.

85.     DraftKings and FanDuel both communicated to customers and prospective customers, such as the Plaintiffs and the Class members, that their employees were not allowed to play on their own sites, but omitted the material fact that their employees were allowed to play on other sites and that other sites' employees were allowed to play on their site.

86.     These Defendants also failed to disclose the fact that employees with access to confidential, internal data were winning large amounts of money on other DFS sites.

87.     Prior to the disclosure of these material omissions and misrepresentations, on or around October 6, 2015, the Plaintiffs and the Class members deposited money into the DFS accounts that the Plaintiffs and the Class members would not have deposited had they known of the material misrepresentations and material omissions.

88.     These material misrepresentations and omissions fraudulently induced the Plaintiffs and the Class members to give Defendants money, which ultimately went to Defendants and their employees through fees and contest prizes.

89.     The Plaintiffs and the Class members acted in reliance on the false, material representations and omissions made by the Defendants, which caused them money damages, harm, and injury.

90.     Had the Plaintiffs and the Class members known that they were competing against individuals with insider knowledge, insider access, and non-public data, the Plaintiffs and the Class members would not have deposited money or engaged in any activity on the Defendants' websites.

91.     The Defendants were at all times aware that the integrity of the games was a material fact in inducing the Plaintiffs and the Class members to give them money in exchange for services and agreeing to the alleged contract.

92.     As a direct and proximate result of Defendants' fraudulent representations and fraudulent omissions, and other fraudulent conduct, the Plaintiffs and the Class members were induced into depositing money into a DFS account and playing a contest that they otherwise would not have played, and suffered financial injury, harm, and money and other damages as described throughout this Complaint.

## COUNT THREE – VIOLATION OF NORTH CAROLINA AND FLORIDA CONSUMER PROTECTION LAW

93.     The Plaintiffs repeat each of the foregoing allegations as if set forth fully herein.

94.     For the reasons set forth in detail above, the Defendants engaged in unfair, unconscionable, and deceptive acts and practices, which acts and practices were "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," in or affecting commerce, which directly and proximately caused significant injury to the Plaintiffs and the Class members, contrary to North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, et seq.

95.     For the reasons set forth in detail above, the Plaintiffs and the Class were consumers, and the Defendants engaged in "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," which directly and proximately caused significant injury to the Plaintiffs and the

Class members, contrary to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq.

## COUNT FOUR – VIOLATION OF STATE STATUTES
## PROHIBITING UNFAIR AND DECEPTIVE ACTS AND PRACTICES

96.     The Plaintiffs repeat each of the foregoing allegations as if set forth fully herein.

97.     Following the passage of the Federal Trade Commission Act, 15 U.S.C. §§ 41 to 58 ("FTC Act"), which prohibits deceptive acts and practices in sales to consumers, the fifty states enacted laws modeled on the FTC Act and are therefore highly similar in terms of content.

98.     The Defendants' actions, as set out above, violate said consumer protection laws of the various states.

99.     The Defendants have engaged in deceptive practices by representing that goods and/or services have characteristics and benefits that they do not have; representing that goods and/or services are of a particular standard, quality, or grade when they are of another; advertising goods and/or services with intent not to sell them as advertised; and engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding.

100.    The conduct alleged and described throughout this Class Action Complaint constitutes unfair or deceptive trade practices predominantly and substantially affecting the conduct of trade or commerce throughout the United States, all in violation of the state deceptive trade practices acts and other similar state statutes prohibiting unfair and deceptive acts and practices.

101.    The Defendants' conduct has directly, foreseeably, and proximately caused damages to the Plaintiffs and the Class members in amounts yet to be determined.

102.    As a direct, foreseeable, and proximate result of the Defendants' violations of the said acts and laws of the various states prohibiting unfair and deceptive acts and practices, the

Plaintiffs and the Class members have suffered actual injuries and damages for which the Defendants are liable.

## COUNT FIVE – CIVIL CONSPIRACY

103.   The Plaintiffs repeat each of the foregoing allegations as if set forth fully herein.

104.   As set forth in detail above, the Defendants collectively engaged in a corrupt or unlawful combination and/or agreement with each other to do an unlawful act, and continued to act in concert after the act was discovered.

105.   Specifically, by affirmatively agreeing to allow competitors' employees to play on their own sites against their own players, and concealing and not disclosing this to the Plaintiffs and the Class members, the Defendants committed negligence, fraud, and/or other tortious and actionable conduct.

106.   This overt act was done pursuant to or in furtherance of the conspiracy to allow their employees and officers to profit, continue to attract new players to their websites, and otherwise profit because of their unlawful activities.

107.   At all relevant times, FanDuel knew that its employees played on DraftKings, and vice versa.

108.   The Defendants gave each other assistance and encouragement in accomplishing the tortious result of having their employees compete against and beat players on other DFS sites.

109.   As a direct and proximate result of the Defendants' concerted actions, the Defendants are both liable to the Plaintiffs and the Class members.

## COUNT SIX – UNJUST ENRICHMENT

110.   The Plaintiffs repeat each of the foregoing allegations as if set forth fully herein.

111.     The Plaintiffs and the class members conferred a benefit upon the Defendants by depositing money and playing in contests on their websites.

112.     The Defendants have been unjustly enriched in retaining the revenues derived from the Plaintiffs' deposits and contest entries, and the deposits and contest entries of the members of the Class, which retention under these circumstances is unjust and inequitable because the Defendants misrepresented the facts concerning the fair play available on their websites.

113.     The Plaintiffs and the Class members were injured as a direct and proximate result of the Defendants' misrepresentations and omissions because the Plaintiffs and the Class members deposited money into Defendant's DFS accounts and paid for entry into contests "of skill," which they would not have done had they known the true facts.

114.     Because the Defendants' retention of the non-gratuitous benefit conferred on them by the Plaintiffs and the members of the proposed classes is unjust and inequitable, the Defendants must pay restitution to the Plaintiffs and the members of the proposed class for the Defendants' unjust enrichment, and/or suffer disgorgement, as ordered by the Court.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against the Defendants jointly and severally as follows:

1.     An Order requiring the Defendants to identify all members of the Class, certifying the Class alleged in this Complaint pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (c)(4), and such other rules as are applicable, and appointing the Plaintiffs and their counsel to represent the Class;

2.     A declaratory judgment that the practices complained of herein are unlawful, and monetary damages;

3.　　An Order requiring Defendants to issue a formal and public apology to Plaintiffs and the Class for Defendants' outrageous conduct;

4.　　An Order awarding a full refund of all money paid to the Defendants as part of the invalid contract, including but not limited to every dollar of the Plaintiffs' losses;

5.　　An Order awarding the Plaintiffs and the Class members actual, compensatory, consequential, statutory, and punitive damages, and any other form of damages provided by law, statute, or otherwise;

6.　　An Order awarding the Plaintiffs and the Class members restitution, disgorgement, or other equitable relief provided by statute, or as the Court deems proper;

7.　　An Order awarding the Plaintiffs and the Class members pre-judgment and post-judgment interest, and any other available similar compensation for delay;

8.　　An Order awarding the Plaintiffs and the Class members reasonable attorney's fees, and costs of suit, including expert witness fees; and

9.　　An Order awarding such other and further relief as this Court may deem to be just and proper in the circumstances presented.

## **JURY TRIAL DEMAND**

A trial by twelve (12) jurors is hereby demanded on all counts and causes of action so triable, to the extent authorized by law.

Dated: <u>Friday, October 30, 2015</u>　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　SHERMAN, SILVERSTEIN, KOHL,
　　　　　　　　　　　　　　　　　　　ROSE & PODOLSKY, P.A.

　　　　　　　　　　　　By:　<u>/s/ Alan C. Milstein</u>
　　　　　　　　　　　　　　　Alan C. Milstein (Bar No. AM2759)
　　　　　　　　　　　　　　　308 Harper Drive, Suite 200
　　　　　　　　　　　　　　　Moorestown, NJ 08057
　　　　　　　　　　　　　　　Telephone: 856-662-0700
　　　　　　　　　　　　　　　Facsimile: 856-488-4744
　　　　　　　　　　　　　　　E-Mail: amilstein@shermansilverstein.com

*Counsel for the Plaintiffs and the Class*